**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANNETTE M. DURNACK, <br> Bethlehem, PA : <br><br> ANNE W. FIORE, <br> Bethlehem, PA : <br><br> TIMOTHY G. WALES, <br> Blandon, PA : <br><br> JEFFREY S. WEIK, <br> Coplay, PA, : <br><br> Individually and on behalf of all others <br> similarly situated, : <br><br>             Plaintiffs, : <br><br>       v. : <br><br> RETIREMENT PLAN COMMITTEE OF <br> TALEN ENERGY CORPORATION, <br> Allentown, PA : <br><br> TALEN ENERGY RETIREMENT PLAN, <br> Allentown, PA : <br><br> and : <br><br> TALEN ENERGY CORPORATION, <br> TALEN ENERGY SUPPLY, LLC, <br> Allentown, PA : <br><br>             Defendants. : | CIVIL ACTION NO. <br><br> 20- <br><br> CLASS ACTION |

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.    Plaintiffs, who are former long-term, senior management employees of a major

energy company, bring this ERISA action for themselves and the members of the Class to obtain

the pension benefits and supplements they were wrongfully denied by defendants.

2.      Plaintiffs worked for Pennsylvania Power and Light ("PPL"), a utility company, in various management positions.  Three of the plaintiffs had careers there of 30 or more years. Under the PPL Retirement Plan, employees like plaintiffs were eligible for "unreduced" early retirement pension benefits if PPL underwent a "Change in Control" ("CIC"), such as a sale or merger, and the new owner subsequently terminated their employment.[1]

3.      During the period 2014-2016, PPL and a private equity firm, Riverstone Holdings LLC, engaged in a two-step transaction under which PPL spun off parts of its power supply businesses to a newly created entity – Talen Energy Corporation and its wholly-owned subsidiaries – Talen Energy Marketing, LLC, Talen Energy Supply LLC, and Susquehanna Nuclear LLC (referred to collectively herein as "Talen Energy").  Despite plaintiffs' long and dedicated service to the business, and their undisputed experience and skills, Talen Energy targeted the positions of these older employees for termination.

4.      As a result of their employment terminations, plaintiffs and the members of the Class were compelled to retire years earlier than each had planned.  Due to the Change in Control, each became entitled to, and should have received, unreduced early retirement pension benefits and pension supplements.

5.      These rights were guaranteed to plaintiffs and the Class by three different sources: the terms of the Talen Energy Retirement Plan adopted by successor employer Talen Energy (the "Talen Energy Plan" or "the Plan"); certain contractual obligations assumed by Talen Energy as part of the transactions between PPL and Talen Energy which also became terms of the Plan; and the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001,

---

[1]  Put simply, the term "Change in Control" refers to a significant change in a corporation's ownership or control, such as occurs in a merger or acquisition.  As defined in this case, the Change in Control made plaintiffs eligible for certain unreduced early retirement pension benefits, as explained further below.

*et seq.*, including ERISA's "anti-cutback rule" which strictly prohibits reduction or elimination of accrued early retirement pension benefits.

6.     Instead of honoring these obligations, however, defendants Talen Energy, the Talen Energy Retirement Plan, and the Retirement Plan Committee of Talen Energy ("the Committee" or the "Plan Committee") acted in concert to conceal and/or misrepresent their benefits obligations to plaintiffs and the Class.   Defendants did this despite an express declaration by Talen Energy's own Board of Directors that the Change in Control provisions of the Talen Plan had in fact been triggered.

7.     Under ERISA, defendants had a strict fiduciary duty to inform plaintiffs and the Class regarding their Change in Control pension rights.   Defendants chose to disregard that duty.

8.     The availability of the Change in Control pension rights only became known to plaintiffs and the Class due to the filing of, and a newspaper article about, the action *Sweeney, et al. v. Retirement Plan Committee of Talen Energy Corporation, et al.*, No. 19-CV-04326-JFL (E. D. Pa., filed September 19, 2019).   The lead plaintiff in that case, Charles M. Sweeney, had learned of the Change in Control provisions when he stumbled upon a cryptic reference to them while engaging in his own independent internet research.   Sweeney then applied for payment of the unreduced CIC pension benefits that were due to him under the Plan.

9.     Defendants, acting through the defendant Plan Committee, responded to Mr. Sweeney.   In their response, they denied the benefits by ignoring the clear terms of the Plan as well as the declaration by their own Board of Directors that a Change in Control had occurred. Defendants also concocted a bad faith, supposed "interpretation" that purported to nullify the CIC provisions.

10.     As a result of defendants' actions and failures to inform eligible terminated employees of their rights, all in violation of their strict ERISA fiduciary duties, plaintiffs and the Class were not even aware of the Change in Control provisions when they were terminated and applied for their pensions.  Consequently, they did not seek these unreduced benefits as part of their pensions.  Defendants' violations deprived plaintiffs and the Class members of the opportunity to make fully informed decisions about their pension benefits.

11.     Defendants' violations also deprived each plaintiff and Class member of substantial pension benefits.  Each named plaintiff was deprived of pension benefits ranging in amount between $ 325,000 and $ 427,000.  In addition, defendants deprived each named plaintiff of pension supplements (discussed further below) ranging in amount between $ 70,000 and $ 99,000.

### JURISDICTION AND VENUE

12.     This Complaint arises under Section 502(a) of ERISA, 29 U.S.C. § 1132(a).  The Court has subject matter jurisdiction over this action under Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), and under 28 U.S.C. § 1331.  In addition, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by Section 502(a) of ERISA, 29 U.S.C. § 1132(a).

13.     Venue is proper in this district under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district; the breaches and violations of law occurred in this district; and defendants reside, do business and are found in this district.  Venue also is proper in this district under 28 U.S.C. § 1391(b), because the acts and omissions that give rise to plaintiffs' claims occurred in this district.

## PARTIES

14.     Plaintiff Annette M. Durnack began her employment with PPL in 2008 and held various management jobs at PPL and Talen Energy during the ensuing nine years.  Her last position was as Director, Retail Energy, at Talen's General Office located in Allentown, Pennsylvania.  In August 2017, plaintiff Durnack's employment was terminated at the age of 55. Defendants concealed from plaintiff Durnack the existence and availability of the CIC pension benefits and she was otherwise unaware of them.  Following her termination, she applied for a lump sum payment of her pension benefits and her retirement under the Plan commenced as of October 1, 2017.  Plaintiff Durnack resides in Bethlehem, Pennsylvania.

15.     Plaintiff Anne W. Fiore began her employment with PPL in 1981 and held various management jobs at PPL and Talen Energy during her ensuing 33 years of service.  Her last position was as Director – Legal Services, at Talen's General Office located in Allentown, Pennsylvania.   In July 2016, plaintiff Fiore's employment was terminated at the age of 57. Defendants concealed from plaintiff Fiore the existence and availability of the CIC pension benefits and she was otherwise unaware of them.  Following her termination, she applied for a lump sum payment of her pension benefits and her retirement under the Plan commenced as of August 1, 2016.  Plaintiff Fiore resides in Bethlehem, Pennsylvania.

16.     Plaintiff Timothy G. Wales began his employment with PPL in 1982 and held various management jobs at PPL and Talen Energy during the ensuing 34 years.  His last position was as Senior Engineer for Susquehanna Nuclear, LLC, in Talen's General Office located in Allentown, Pennsylvania.  In June 2016, plaintiff Wales' employment was terminated at the age of 57.  Defendants concealed from plaintiff Wales the existence and availability of the CIC pension benefits and he was otherwise unaware of them.  Following his termination, he applied for monthly annuity payments of his pension benefits and his retirement under the Plan

5

commenced as of December 1, 2016.  Plaintiff Wales resides in Blandon, Pennsylvania.

17.     Plaintiff Jeffrey S. Weik began his employment with PPL in June 1986 and held various management jobs at PPL and Talen Energy during the ensuing 32 years.  His last position was as Senior Engineer for Susquehanna Nuclear, LLC, in Talen's General Office located in Allentown, Pennsylvania.  In July 2018, plaintiff Weik's employment was terminated at the age of 55.  Defendants concealed from plaintiff Weik the existence and availability of the CIC pension benefits and he was otherwise unaware of them.  Following his termination, he applied for lump sum payment of his pension benefits and his retirement under the Plan commenced as of May 1, 2019.  Plaintiff Weik resides in Coplay, Pennsylvania.

18.     All plaintiffs and Class members are vested participants of the Plan, within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7).

19.     Defendant Retirement Plan Committee of Talen Energy Corporation is the "Plan Administrator" of the Plan within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A).  It is also a "named fiduciary" of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a), as well as a "fiduciary" of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  The Committee is legally responsible for administering the Plan in conformity with its terms and the controlling provisions of ERISA and the Internal Revenue Code.  The individual members of the Committee are senior executives of defendant Talen Energy who were appointed by its Board of Directors.  The identities of the individual members of the Committee, other than Russell R. Clelland and Karla A. Durn, are not currently known to plaintiffs.  However, the Committee members will be added as defendants upon receipt of identifying information.

20.     Defendant Talen Energy Retirement Plan is a defined benefit "pension benefit plan" within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2).  The Plan's purpose is to provide post-retirement income to employees of Talen Energy and its subsidiaries, and their beneficiary spouses and other eligible dependents.  The Plan is the successor plan to the PPL Plan and is obligated to maintain the PPL Plan benefits under ERISA and contractual obligations of Talen Energy which became incorporated provisions of the Plan.

21.     Defendant Talen Energy Supply LLC is a Delaware corporation with a place of business at 600 Hamilton Street, Allentown, Pennsylvania, 18101.  Talen Energy Supply is the formal sponsor of the Plan and also a "fiduciary" of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Talen Energy Supply is a wholly-owned subsidiary of defendant Talen Energy Corporation, a Delaware corporation which has a place of business at the same address.  These two defendants are referred to collectively as "Talen Energy."  The benefit reductions and eliminations,  and the breaches of fiduciary duty that lie at the heart of this action were planned, orchestrated and effectuated by Talen Energy through the executives who sat on the defendant Plan Committee and carried out those actions.  In committing these ERISA violations, Talen Energy and the Plan Committee members were assisted by Talen Energy's outside legal counsel, including attorney Barry L. Klein.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class, defined as:

> All persons who have been management or other non-union employee participants (or their surviving beneficiaries) in the Talen Energy Retirement Plan whose employment terminated on or after they attained age 55 and during the period between June 1, 2015 and December 5, 2019.

The members of the Class are so numerous that joinder of all members is impracticable.  The

exact number of Class members is currently unknown to plaintiffs.  However, plaintiffs have already disclosed in their pre-filing discussions with counsel for defendants the names of 21 additional Plan participants who are Class members.  In addition, the IRS Form 5500 Annual Reports for the Plan for plan years 2015 to 2018 show that hundreds of employees ceased to be active participants during this time period.  At its inception on June 1, 2015, the Talen Plan had 2,058 actively employed participants.  In contrast, the Plan had only 1,273 actively employed participants as of June 30, 2018.  This data establishes that 785 Plan participants were terminated during this period.  It is believed that the great majority of these individuals are Class members.  Given the large number of Class members and their post-retirement dispersion in multiple states, it is impracticable for all Class members to join in individual litigation.

23.     Common questions of law and fact exist as to all members of the Class.  These common questions of law and fact include:

(a)     Whether plaintiffs and the members of the Class were eligible for and entitled to payment of the unreduced early retirement pension benefits and pension supplements which are the subject of this Complaint;

(b)     Whether the unreduced early retirement pension benefits which are the subject of this Complaint were protected against cut-back, reduction or elimination by Section 204(g) of ERISA, 29 U.S.C. § 1054(g), and by certain transaction documents which became part of the terms of the Plan;

(c)     Whether the omission from the Talen Plan of the pension supplements and of unreduced pension benefits based on receipt of severance benefits, and the denial of these benefits to plaintiffs and the members of the Class, violated these provisions of ERISA and the Plan;

(d)     Whether Talen and the Committee and its individual members violated these provisions of ERISA, as well as the strict fiduciary duties imposed on them by Section 404(a) of ERISA, 29 U.S.C. § 1104(a), by, *inter alia*, concealing from plaintiffs and the members of the Class the existence and terms of the Change in Control benefits and their entitlement thereto; failing to include, and to correct the omission of, benefit provisions that were required to be included in the Plan; implementing illegal plan amendments by deleting provisions that had been included in the predecessor PPL Plan at the time the terms of that plan were carried over to the new Talen Plan; and continuing to administer the Plan in a manner that has deprived plaintiffs and the members of the Class of their legally protected benefits;

(e)     Whether plaintiffs and the members of the Class satisfied the conditions for the subject unreduced early retirement pension benefits and pension supplements and therefore are entitled to declaratory, injunctive and other relief to (1) declare their rights to these benefits,  (2) compel the Committee and the Plan to pay all benefits to which plaintiffs and Class members are entitled in the correct amounts, including retroactive earlier commencement dates where appropriate, whether or not the participant applied for these benefits in the past; and (3) compel the Committee to properly administer the Plan in the future; and

(f)     Whether each plaintiff and member of the Class is entitled to the relief prayed for in this Complaint.

24.    Each plaintiff is a member of the Class and the claims of each plaintiff are typical of the claims of the members of the Class.

25.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and they have retained counsel who are competent and experienced in ERISA and class action litigation.  Plaintiffs do not have interests that are antagonistic to, or in conflict with, the members of

the Class they seek to represent.

26.     Class certification is appropriate under Rules 23(b)(1)(B) and (b)(2), Fed. R. Civ. P.,

because adjudications with respect to individual members of the Class would as a practical matter

be dispositive of the interests of other non-party members, and defendants have acted on grounds

generally applicable to the Class, making appropriate declaratory, injunctive and other equitable

relief on a class-wide basis.

27.     If necessary, class certification also would be appropriate under Rule 23(b)(3),

Fed. R. Civ. P., because the common issues of law and fact presented in this action predominate

over any individual issues.  A class action is superior to other available methods for the fair and

efficient adjudication of this controversy, because joinder of all members is impracticable.

Furthermore, the expense and burden of individual litigation make it impractical for Class

members to pursue individual litigation to vindicate their rights.  Plaintiffs are not aware of any

problems that would militate against the maintenance of this action as a class action.

## FACTUAL BACKGROUND

### A.     PPL's Sale of Power Businesses to Talen Energy.

28.     In or about 2013, PPL's management determined that it would be advantageous to

spin off and divest its Energy Supply Business, including certain power generation plants and

other assets of its power-generating businesses in the Mid-Atlantic region, principally in

Pennsylvania.

29.     According to PPL's SEC Form 8-K Report filed June 12, 2014, on June 9, 2014

PPL, Talen Energy Holdings, Inc., Talen Energy Corporation, PPL Energy Supply, LLC, and

other acquisition-related entities entered into a Separation Agreement, a Transaction Agreement,

and an Employee Matters Agreement.  Pursuant to the first two agreements, PPL agreed to spin

off the business of PPL Energy Supply to PPL's shareowners, and to immediately combine that

business with the merchant power generation businesses of companies affiliated with Riverstone

Holdings, LLC ("Riverstone").   The product of these steps was to be named "Talen Energy

Corporation" with wholly owned subsidiaries including Talen Energy Supply LLC, Talen

Energy Marketing LLC, and Susquehanna Nuclear LLC.

30.     The initial spin-off closed and became effective on June 1, 2015.  According to its

SEC Form 8-K Report dated June 1, 2015, Talen Energy was formed when PPL spun off its

competitive power generation business and immediately combined it with the competitive

generation business owned by Riverstone, a private equity firm.  Upon completion of those 2015

transactions, PPL shareholders owned 65 percent of Talen Energy's common stock; the other

35% was owned by affiliates of Riverstone.   Paul A. Farr, who had been Executive Vice

President and Chief Financial Officer of PPL, assumed the CEO position at Talen Energy,

leading "an experienced Talen Energy management team that has decades of experience in

power generation, commercial operations and corporate strategy." *Id.*

31.     According to the June 1, 2015 8-K Report, at the time of the June 2015 closing,

Talen Energy owned about 15,000 megawatts of generating capacity, primarily located in two of

the largest, most transparent and most liquid competitive power markets in the United States:

PJM (Mid-Atlantic) and ERCOT (Texas).   On a pro-forma basis, the assets comprising Talen

Energy generated annual revenue of $4.3 billion in 2014.

32.     Subsequently, in November and early December 2015, Riverstone communicated

to Talen Energy's Board of Directors its interest in acquiring Talen Energy's outstanding shares,

which were not beneficially owned by Riverstone.  Riverstone offered to Talen Energy $11.00

per share in cash (later increased to $14.00), which represented a premium of approximately

45%.  These sale negotiations culminated in an Agreement and Plan of Merger, dated June 2,

2016, followed by a tender offer to Talen shareholders set forth in a proxy statement dated September 2, 2016.  This second transaction between Talen Energy and Riverstone closed on December 6, 2016.

**B.    Talen Energy Was Obligated to Provide the Same Pension Benefits Under the Successor Talen Energy Retirement Plan as Had Existed Under the Predecessor PPL Retirement Plan.**

33.    The predecessor PPL Retirement Plan had provided a number of valuable and protected early retirement pension benefits.  These benefits had accrued to plaintiffs and the Class members.

**1.  The Employee Matters Agreement.**

34.    As part of the first transaction with Riverstone, on or about June 9, 2014 PPL, Talen Energy, and the other acquisition-related entities entered into an "Employee Matters Agreement."  This Agreement governed the treatment of employees who would be affected by the transaction, including their pension and other employment benefits.  Section 2.2 of the Employee Matters Agreement became effective upon the spin-off of PPL Energy Supply on June 1, 2015.  It required the preservation of all forms of employee benefits for plaintiffs and the Class members.  The Agreement specifically provided that "For a period of at least twenty-four (24) months following the [June 1, 2015] Separation Date, Newco [*i.e.,* Talen Energy] shall provide . . . to each Energy Supply Employee" substantially similar severance benefits, retirement benefits, and other employee benefits:

> (a)    For a period of at least twenty-four (24) months following the [June 1, 2015] Separation Date, NewCo shall provide or shall cause to be provided to each Energy Supply Employee (i) a base salary and a bonus opportunity that are no less favorable in aggregate value than the base salary and bonus opportunity provided to such Energy Supply Employee immediately before the Separation Date, (ii) eligibility to participate in a severance benefit arrangement that provides potential severance benefits that are no less favorable in aggregate value than the severance benefits provided under the severance benefit arrangement, if any, set forth in Section 5.11(a) of the Parent Disclosure

Letter in which such Energy Supply Employee is eligible to participate immediately before the Separation Date and (iii) other compensation and employee benefits that are substantially similar in the aggregate to the other compensation and employee benefits provided to such Energy Supply Employee immediately prior to the Separation Date (it being understood that one type of compensation or benefit may be substituted for another as long as compensation and employee benefits are substantially similar in the aggregate), except in each case, as necessary to comply with applicable Law; provided, however, that this Section 2.2(a) shall not apply to any Union Employee, whose terms and conditions of employment shall be governed by any applicable Collective Bargaining Agreement. [Employee Matters Agreement § 2.2]

## 2. The Merger Agreement.

35.     In addition to the Employee Matters Agreement, as part of the second transaction with Riverstone, on June 6, 2016, Talen Energy and the acquisition-related entities entered into an "Agreement and Plan of Merger."  Section 5.11 of the Merger Agreement, which became effective upon the consummation of the transaction on December 6, 2016, likewise provided for the continuation and preservation of all pension and other benefits.  The Merger Agreement also expressly provided that the transaction would be deemed to constitute a "Change in Control" for purposes of all employee benefit plans.  The relevant provisions are as follows:

**Section 5.11 Employee Matters**.

(a)     From the Effective Time through the twelve (12) month anniversary of the Effective Time (the "Continuation Period"), with the exception of employees represented by any labor organization, Parent shall provide, or shall cause to be provided, to each employee of the Company and its Subsidiaries (including the Surviving Corporation and its Subsidiaries) as of the Effective Time (each such employee not represented by a labor organization, a "Company Employee" [sic]), for so long as the Company Employee is employed by the Surviving Corporation or any of its Subsidiaries during the Continuation Period, . . . (ii) employee benefits (excluding, for the avoidance of doubt, incentive compensation and retiree welfare benefits) that are no less favorable in the aggregate than the same provided to such Company Employee immediately prior to the Effective Time.

* * * *

(c)     From and after the Effective Time, Parent shall, or shall cause the Surviving Corporation and its Subsidiaries, to assume and honor all Company

Plans in accordance with their terms as in effect immediately before the Effective Time and **the Transactions shall be deemed to constitute a "change in control", "change of control" or "corporate transaction", as applicable, under such Company Plans**. [Merger Agreement at § 5.11(a) (emphasis added)]

The Merger Agreement defines "Company Plans" to include "each employee benefit plan under ERISA" and "each other material employee benefit or compensation plan" including "retirement plan . . . [or] defined benefit plan." (Merger Agreement at 83)  The Proxy Statement recites that the Merger Agreement was unanimously approved and adopted by Resolution of the "Disinterested" members of the Board of Directors at the Board meeting on June 2, 2016. (*See* Definitive Proxy Statement, dated September 2, 2016, at 8, 26).

36.     Defendant Plan Committee acknowledged Talen Energy's legal obligations to continue paying pension and other benefits.  Two days after the second transaction with Riverstone, Talen Energy, acting through the Plan Committee, adopted Amendment No. 5 to the Plan.  This Amendment was dated December 8, 2016 but was retroactively effective to June 1, 2015, which was the original effective date of the Talen Plan.  This Amendment recites that, "the [Talen Energy Retirement] Plan originated as a spin-off from the PPL Retirement Plan and is, therefore, required under law to preserve all benefits, rights and features of the PPL Retirement Plan."  The Amendment further stated that the Plan was "legally required in order to preserve all benefits rights and features to which participants are entitled".  In addition, the Amendment proceeded to restore to the Plan an omitted sub-provision of PPL Plan Section 5.3(a)(3) applicable to unionized employees.  However, the Amendment failed to restore certain other sub-provisions applicable to plaintiffs, as explained in paragraphs 58 and 61-63 below.

**C.      The Plan Provides Unreduced Early Retirement Pensions to Participants Whose Employment Is Terminated After a Change in Control.**

37.     Section 5.3(a)(3) of the Talen Energy Plan – which preserves the benefits due under PPL Plan Section 5.3(a)(4) – states that a management employee "whose employment is

terminated by a Participating Company within three years after a Change in Control and who has an Early Retirement Date under [the provision defining a Change in Control]" and who was then age 55 or older is entitled to "an unreduced annual pension, payable monthly, equal to the Participant's Accrued Benefit as of his Early Retirement Date."

38.    Section 1.13(b) of the Talen Energy Plan provides the following definition for a "Change in Control":

(b)(1)   "Change in Control" means the occurrence of any one of the following events:

(i)  the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, on the date hereof, constitute the Board of Directors of Talen Energy Corporation and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of Talen Energy Corporation[ )²] whose appointment or election by the Board of Directors of Talen Energy Corporation or nomination for election by Talen Energy Corporation's shareowners was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(ii)  any Person becomes the beneficial owner (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Talen Energy Corporation representing 20% or more of the combined voting power of Talen Energy Corporation's then outstanding securities entitled to vote generally in the election of directors;

(iii)  there is consummated a merger or consolidation of Talen Energy Corporation or any direct or indirect subsidiary of Talen Energy Corporation with any other corporation or other entity, other than (A) a merger or consolidation which would result in the voting securities of Talen Energy Corporation outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof), in combination with the ownership of any trustee or other fiduciary holding securities under an employee benefit plan of Talen Energy Corporation or any subsidiary of [sic – words omitted – should read "Talen Energy Corporation"], at least 60% of the combined

---

² This provision, as it appears in the Talen Energy Plan, was incorrectly transcribed.  The missing close parenthesis appears here in the parallel provision § 1.12(b)(1) of the predecessor PPL Retirement Plan.

voting power of the securities of Talen Energy Corporation or at least 60% of the combined voting power of the securities of such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or (B) a merger or consolidation effected to implement a recapitalization of Talen Energy Corporation (or similar transaction) in which no Person is or becomes the beneficial owner, directly or indirectly, of securities of Talen Energy Corporation (excluding in the securities beneficially owned by such Person any securities acquired directly from Talen Energy Corporation or its Affiliates) representing 20% or more of the combined voting power of Talen Energy Corporation's then outstanding securities;

(iv)   the shareowners of Talen Energy Corporation approve a plan of complete liquidation or dissolution of Talen Energy Corporation; or

(v)   the Board of Directors of Talen Energy Corporation adopts a resolution to the effect that a "Change in Control" has occurred or is anticipated to occur.

(2)  Notwithstanding the foregoing, the occurrence of one or more of the events set forth in Paragraph 1.13(b)(1)(i), (iii) or (iv) shall not constitute a Change in Control if the initial public disclosure relating to such event including any proposal with respect thereto, is made jointly by Talen Energy Corporation and the Person effecting or proposing to effect a "Change in Control." [Talen Energy Retirement Plan, June 1, 2015, at I-4 to I-6.]

39.      Under these Change in Control provisions, an employee is eligible to receive throughout retirement, and commencing as early as age 55, 100% of his/her then accrued pension benefit without reduction for early commencement.  In the absence of these CIC benefits, the pension benefit would be reduced by 8% for each year before age 60.  Steeper reductions apply to a participant such as plaintiff Durnack who has fewer than 20 years of service.

40.      As a direct result of defendants' violations, each plaintiff and Class member was severely affected by these reductions.  For example, the named plaintiffs' pension benefits were cut in amounts ranging between 18% and 47%.  Translated into dollars, their pension benefits were unlawfully reduced in amounts ranging between $ 325,000 and $ 427,000.

**D.     Plaintiffs and the Class Satisfied the Conditions for Unreduced Pension Benefits Due to the Change in Control.**

41.      Each plaintiff and Class member lost his/her employment within three years of a

Change in Control.  The other conditions for triggering CIC benefits were likewise satisfied, under several different subparts of the CIC definitions.

        a.     <u>Section 1.13(b)(1)(i)</u>.  The December 6, 2016 stage 2 acquisition by Riverstone constituted a Change in Control under subsection (i) of Section 1.13(b)(1).  The individuals who were serving "on the date hereof," *i.e.*, the June 2015 adoption date of the Plan, or were subsequently seated on the Board, ceased to constitute a majority of the Board of Directors of Talen Energy.  Talen's Form 14A Proxy Statement for the Riverstone acquisition, dated September 2, 2016, at pages 114-116, identified 8 individuals who had been serving as Talen directors since June 2015.  Talen's SEC Form 8-K filing, dated December 6, 2016, states in Item 5.02 that, "Effective upon completion of the Merger" four listed individuals, including existing directors Alexander and Hoffman who had been seated in June 2015 by Riverstone, "became the directors of the Company."  But, the remaining six out of eight directors, equal to 75% of Talen's pre-existing directors, ceased to serve as directors:  "As a result of the Merger, Frederick M. Bernthal, Edward J. Casey, Jr., Philip G. Cox, Paul A. Farr [the CEO, *see* below], Louise K. Goeser and Stuart E. Graham are no longer directors of the Company."  This exodus of six out of eight directors from the Board constitutes a departure of more than a majority of the Board.  Consequently, a Change in Control within the meaning of Section 1.13(b)(1)(i) occurred as a result of the December 6, 2016 acquisition by Riverstone.

        b.     <u>Section 1.13(b)(1)(ii)</u>.  The December 6, 2016 acquisition by Riverstone also constituted a Change in Control under subsection (ii) of Section 1.13(b)(1).  That provision is satisfied when "any Person becomes the beneficial owner (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Talen Energy Corporation representing 20% or more of the combined voting power of Talen Energy Corporation's then

outstanding securities."   In the plan-based claim proceedings for former plaintiff Charles M. Sweeney, the Retirement Plan Committee took the position that this provision was not satisfied "because the Riverstone entities did not become 20% owners of Talen as a result of the December 6, 2016 transaction" – they actually became owners of an *additional* 65% of Talen shares. (Committee March 28, 2017 letter at 2.)  This reading was mistaken.  It ignored the plain wording of the Talen Energy Plan.  The Plan does not limit subsection (ii) to instances when a person "*first* becomes the beneficial owner" of 20% of the combined voting power.  Rather, it requires nothing more than acquisition of 20% or more of the combined voting power.  There is no condition based on the previous level of ownership.  As stated in the December 6, 2016 press release on page 1, Riverstone at that time acquired "approximately" 65% of the voting shares of Talen Energy.   This is more than sufficient to meet the threshold of 20% under Section 1.13(b)(1)(ii), and a Change in Control occurred for this reason as well.

        c.     The original June 2015 combination between Riverstone and Talen Energy also satisfied the requirement of Section 1.13(b)(1)(ii).  The June 3, 2016 press release establishes that immediately following the spin-off of PPL Energy Supply as "Talen Energy" on the June 1, 2015 Closing Date, Riverstone affiliates acquired "approximately 35%" of the Talen common stock, with the remaining 65% continuing to be held by pre-existing owner PPL. Talen's Form 8-K filed on June 2, 2015 stated in Item 5.01 – entitled "Changes in Control of the Registrant" – that "Immediately following the completion of "the spin-off of PPL Energy Supply, "65% of Talen Energy's common stock is owned by PPL shareowners and the remaining 35% is owned by RJS, affiliates of Riverstone."   That event likewise constituted a Change in Control under subsection (ii) of Section 1.13(b)(1).

d.      Section 1.13(b)(1)(iii).   A Change in Control also occurred through the December 6, 2016 Riverstone acquisition pursuant to subsection (iii) of Section 1.13(b)(1). Subsection (iii) is satisfied when "there is consummated a merger or consolidation" of Talen Energy with any other corporation or entity.   As stated in item 2.01 of the Form 8-K dated December 6, 2016, the acquisition completed a "merger" whereby Talen Energy became a private entity.   "Each share of common stock" of Talen Energy "was cancelled," trading was halted, and the company was delisted on the NYSE (item 3.01).   The former shareholders of Talen Energy did not receive shares in a new entity.   Rather, they received cash payments for their shares.[3]

e.      Section 1.13(b)(1)(v).  The action of the Talen Energy Board establishes a fifth reason why a Change in Control must be found.  This section requires that a Change in Control must be recognized when "the Board of Directors of Talen Energy Corporation adopt[s] a resolution *to the effect that* a 'Change in Control' has occurred or is anticipated to occur" (emphasis added).  As explained in paragraph 35 above and in paragraphs 42-46 below, the Talen Energy Board of Directors by resolution adopted the Merger Agreement.  That Agreement expressly stated that the transaction constituted a "Change in Control" for all employee benefit plans.  Despite this express Board declaration, the Committee ignored the terms of the Plan by imposing an additional condition that has no basis in the Plan.  According to the Retirement Plan Committee's decision in the Sweeney claim proceedings, since "the Committee was never directed by a Board resolution to treat the December 6, 2016 transaction as a 'Change in Control'

---

[3]  The exceptions set forth in subsections A and B of Section 1.13(b)(iii) are inapplicable here.  Subsection A is not applicable because the shareholders holding 60% of the combined voting power of Talen Energy securities did not "continue to represent at least 60% of the combined voting power of the securities of such surviving entity."   The exception in subsection B is inapplicable because the December 2016 Riverstone acquisition did not "implement a recapitalization" in which no person became the owner of at least 20% of the combined voting power of Talen Energy.

for purposes of the Plan," subsection (v) of Section 1.13 (b)(1) could not be satisfied.  But nothing in the Plan requires the Board's resolution to refer to the Plan by name or to "direct" the Plan or Committee to do anything.  The Committee's newly-manufactured requirement of a resolution that includes an express "direction" to the Committee therefore has no basis in the Plan's provisions.  Rather, the Plan says plainly – and broadly – that any resolution of the Board of Directors that states that a Change in Control has occurred or is anticipated to occur, or otherwise includes a statement "*to the effect that* a 'Change in Control' has occurred or is anticipated to occur" will satisfy the requirements of Section 1.13(b)(1)(v).  The Board of Directors did exactly that by signing the Merger Agreement and adopting it in a Board resolution.

42.     Further evidence of defendants' bad faith "interpretation" was revealed when the Retirement Plan Committee produced an internal memorandum in response to Sweeney's document requests during his claim appeal.  The memorandum was subject to production pursuant to the fiduciary exception to the attorney-client privilege.   This was a March 10, 2017 Memorandum to the Committee from outside counsel Barry L. Klein.   The memorandum acknowledged that "the Board has the discretion to declare by resolution that a Change in Control exists for purposes of the Plan for any reason."  (March 10, 2017 Memorandum at 6). The Klein memorandum then attaches and describes portions of the Merger Agreement with Riverstone "which the Committee should consider."  Attorney Klein describes the provision as follows:

> Section 5.11(c) of the Merger Agreement [quoted in Complaint ¶ 28 above] provides that "[Riverstone] shall, or shall cause [Talen] to assume and honor all Company [Employee Benefit] Plans . . . and **the Transaction shall be deemed to constitute a 'change in control', 'change of control' or corporate transaction as applicable under such Company Plans."** Presumably, the Board adopted the entire Merger Agreement by resolution and therefore **it would be disingenuous**

**to suggest that there is no evidence that the Board invoked or did not invoke Section 1.13(b)(1)(v).**   [Klein March 10, 2017 Memorandum at 6 (emphasis added).]

43.     The Merger Agreement defines "Company Plans" to include "each employee benefit plan under ERISA" and "each other material employee benefit or compensation plan" including "retirement plan . . . [or] defined benefit plan."  (Merger Agreement at 83, attached to Klein memo as Tab 5.)

44.     Further, the Proxy Statement for the 2016 transaction recites that the Merger Agreement was unanimously approved and adopted by Resolution of the "Disinterested" members of the Board of Directors at the Board meeting on June 2, 2016.  (*See* Definitive Proxy Statement, dated September 2, 2016, at 8, 26).

45.     Talen Energy also filed a Form 8-K with the SEC on December 6, 2016.  The Form 8-K provided further proof of a Change in Control.  Item 5.01, under the title "Changes in Control of Registrant," clearly states as follows:  "As a result of the Merger, a change in control of the Company occurred, and the Company is now a wholly owned subsidiary of the Sponsor Entities.  The Sponsor Entities are affiliated with investment funds advised by Riverstone [Holdings LLC]."

46.     Additional proof of a Change in Control is found in the December 6, 2016 Form 8-K.  That filing states in Item 5.02 that the Board of Directors through its Compensation Committee acted on December 1, 2016 to amend the "performance unit award agreements" for Talen CEO and Director Paul A. Farr and three other senior Talen executives.  This amendment, which is attached to the Form 8-K as Exhibit 10.3, added a new Section 7 to the agreements.  New Section 7 provided that, "upon consummation of the transaction contemplated by the Merger Agreement" with Riverstone, Farr and the other executives would receive a cash payment "equal to the . . . total number of shares of Company common stock that would be

delivered to the Participant upon a Change in Control pursuant to Section 2(c) herein" times $14.00.[4]  The amendment states further that "capitalized terms [such as "Change in Control" are] set forth in the Participant's Change in Control Agreement."  The Change in Control Agreement for Mr. Farr is set out in the Talen Energy Corp. Form 8-K filed on January 15, 2016.  This filing recites in Item 5.02 that Mr. Farr, as a PPL-heritage employee, was party to a particular form of PPL Change in Control ("CIC") Agreement.  It goes on to note that the Employee Matters Agreement which became operative upon the Talen spinoff from PPL effective June 1, 2015 requires preservation for PPL employees of all forms of benefits for a period of two years.  The January 15, 2016 Form 8-K then states that the Change in Control Agreement for Mr. Farr contains a particular definition of Change in Control and proceeds to enumerate the five prongs of this definition more or less verbatim.  <u>The definition of a CIC that appears in Mr. Farr's CIC Agreement is the same as the CIC definition found in Section 1.13 of the Talen Plan applicable to plaintiffs and the Class</u>.

47.     This equivalence is not surprising, because under both Section 5.11 of the Merger Agreement and Section 2.2 of the Employee Matters Agreement, Talen was obligated to replicate the terms of the PPL Retirement Plan for plaintiffs, Mr. Farr, and other PPL-heritage employees who are Class members.  The terms of the PPL CIC Agreement applicable to Mr. Farr accordingly used the same definition as the qualified retirement plans, the PPL Retirement Plan and the Talen Energy Retirement Plan.

48.     These SEC filings prove a crucial fact – the Talen Board of Directors approved the payment to Mr. Farr of a number of CIC pension benefits under the Plan.  It also approved payment to Farr of "non-qualified" executive pension and other benefits, including severance

---

[4]  Mr. Farr's Performance Unit Agreement was not reproduced in the SEC filings and the Committee unlawfully denied access to it during the Sweeney claim proceedings.

and incentive payments.   All of this was based upon the fact that a Change in Control had occurred – a Change in Control that was determined using **the very same definition of a CIC that applies to plaintiffs and the Class under Section 1.13 of the Talen Energy Retirement Plan.**

### E.       The Exceptions to § 1.13(b)(i) and (iii) Are Not Applicable Here.

49.       Under the Plan, plaintiffs and the Class are entitled to the CIC benefits, including unreduced early retirement pensions and pension supplements, if they satisfy any or all of the CIC definitions.   The defendant Retirement Plan Committee, however, strained to manufacture a way around these entitlements.   In the Committee's letters denying Mr. Sweeney's claim for unreduced benefits, the Committee asserted that Section 1.13(b)(2) of the Plan applied.   Under Section 1.13(b)(2), the Committee asserted, subsections (i) and (iii) of the CIC definitions (discussed above, relating to changes in directors and to mergers/consolidations respectively) were carved-out and unavailable because the initial public disclosure of the 2016 transaction with Riverstone Holdings was (supposedly) "made jointly by Talen Energy Corporation and the [other party to the transaction]."   For this assertion of a joint press release, the Committee relied solely upon a June 3, 2016 Talen Energy press release.

50.       This argument is self-defeating.   On its face, the June 3, 2016 Talen Energy press release was not a "joint press release."   The Committee's conclusion was erroneous for at least the following four reasons:

a.       the only corporate logo on the press release is Talen's logo;

b.       the only contact persons listed at the beginning and end of the press release are Talen Energy personnel located in Allentown, PA;

c.       the issuing location is "Allentown, PA" where Talen Energy alone is located; and

d.      the press release states in the very first sentence that "Talen Energy Corporation (NYSE: TLN) . . . announced today . . .."

51.     As further evidence of the Retirement Plan Committee's bad faith, the Committee's decision letter to Mr. Sweeney enclosed a copy of the June 3, 2016 press release that was incomplete.  A comparison between the incomplete version produced to Sweeney with the version of this release found on Talen Energy's own website reveals a significant addition.  At the end of the text on the final page, the Talen website version says:  "SOURCE Talen Energy Corporation."   The same four words appear on the version of the press release published by Talen Energy on the PR Newswire website.

52.     The history of the initial Talen Energy spin-off further demonstrates that when these companies jointly issued a press release, they were very clear about its joint nature.   On June 9, 2014, PPL issued a press release concerning the initial transaction planned with the Riverstone entities.   It began with the following statement:  "PPL Corporation (NYSE: PPL) and Riverstone Holdings LLC, a leading energy and power investment firm, announced Monday (6/9) a definitive agreement to combine."   As one would expect, that joint release also identified media contacts at both PPL and Riverstone and referred readers to both the PPL and Riverstone websites.

53.     Here, by contrast, there was no mention of two parties issuing a joint statement.   There was just a press release issued solely by defendant Talen Energy.

54.     Accordingly, contrary to the Plan Committee's assertions, the exclusion stated in Section 1.13(b)(2) has no application here and the Plan Committee therefore had no justification for treating subsections (i) and (iii) of the CIC definitions as though they had been nullified and were unavailable bases for the benefits.

24

55.     As Talen Energy's own Board of Directors expressly determined and resolved, the existence of a Change in Control cannot be disputed.

**F.      Plaintiffs and the Class Also Are Entitled to Unreduced Early Retirement Benefits Even If No Change In Control Occurred.**

56.     As described above (¶ 34), Section 2.2 of the Employee Matters Agreement required the preservation for PPL-heritage employees like plaintiffs and the Class of all forms of benefits for a period of at least two years.  The June 2016 Merger Agreement likewise required preservation of these benefits (¶ 35), as did Section 204(g) of ERISA, 29 U.S.C. § 1054(g).

57.     In violation of these Agreements and ERISA, the Talen Plan omitted several provisions that had been part of the PPL Retirement Plan, under which Plaintiffs and the Class were entitled to unreduced early retirement pension benefits.

58.     The PPL Retirement Plan had provided in Section 5.3(a)(3)(D) that plaintiffs and the Class were entitled to unreduced early retirement benefits, without regard to whether or not a Change in Control had occurred.  This benefit entitlement was based on their execution of a separation/severance agreement and release pursuant to company policy for displaced managers:

> (D)  A Participant who qualifies for benefits pursuant to PPL's Displaced Manager's Policy (SPM Policy 606) or PPL's Policy on Loss of Qualifications (SPM Policy 607), and who executes a severance agreement and release as specified by a Participating Company.  [PPL Retirement Plan, § 5.3(a)(3)(D); *see also* PPL Plan Appendix F.]

Pursuant to its contractual obligations under the two transaction-related Agreements, Talen Energy continued the same policy and severance program and likewise should have preserved and included this alternative provision for unreduced pensions in the successor Talen Energy Plan.  But, as drafted by defendants, the Talen Energy Plan failed to include any portion of Section 5.3(a)(3)'s provisions for unreduced pensions.   Instead, defendants omitted this subsection in its entirety, in violation of both the Agreements and ERISA.

59.     Each plaintiff and Class member was provided job termination severance benefits under Talen Energy's successor version of the cited PPL employment policies, including the Talen Energy Severance Benefits Plan.   Each plaintiff and Class member also signed a "Separation Agreement and General Release."   Defendants nevertheless unlawfully deprived plaintiffs and the Class members of unreduced early retirement pension benefits by omitting Section 5.3(a)(3)(D) from the Talen Energy Plan.   These benefits were not conditioned upon a Change in Control.

> **G.     In Addition to Unreduced Pension Benefits, Plaintiffs and the Class Also Were Unlawfully Deprived of Pension Supplements to Which They Were Entitled.**

60.     Plaintiffs and the Class were not limited under the PPL Retirement Plan to unreduced pension benefits.   They also were eligible to receive pension supplements.   The PPL Retirement Plan had provided temporary pension supplements in Section 5.3(b) to any participant "who satisfies the criteria set forth in [PPL Plan] Subsection 5.3(a)(3)(C), (D), or (E) or 5.3(a)(4) above."   These supplements provided (a) a monthly supplement of not more than $1,000 per month, beginning with the month the participant retires through the month he/she attains eligibility for reduced Social Security benefits (age 62).   The PPL Plan had further provided for a second monthly supplement of not more than $250 per month, starting with the month the participant attains eligibility for reduced Social Security benefits (age 62) through the month the participant becomes entitled to receive unreduced Social Security benefits (age 66+). Based on plaintiffs' birthdates and final compensation, these pension supplements should have totaled between $ 70,500 and $ 99,000 for the plaintiffs.

61.     In violation of its duties, Talen Energy eliminated these pension supplement benefits.   It did so by omitting all of the cited parts of § 5.3(a)(3), as well as the former PPL § 5.3(a)(4).   Unlike Section 5.3(b) of the PPL Plan quoted in the preceding paragraph, Section

5.3(b) as incorporated into the new Talen Plan mistakenly refers to former PPL Plan § 5.3(a)(<u>5</u>), which was renumbered in the Talen Plan as § 5.3(a)(4).  That provision deals with participants who are terminated between the ages of 45 and 54, a group which was not entitled to supplements under the PPL Plan.  The provisions that had been set forth in § 5.3(a)(4) of the PPL Plan – and which Talen Energy was obligated to carry-over and preserve in its new plan – were different – they provided pension supplements that were intended to help tide over participants age 55+ who retire due to a Change in Control and who are approaching, but not yet eligible for, Social Security payments.  These 55 and older participants had been covered by the original PPL Plan § 5.3(a)(4), but the Talen Plan drafters mistakenly referred to the wrong subsection.

62.     The reference in Section 5.3(b) of the Talen Plan to § 5.3(a)(4) is a transcription error that occurred when the PPL Plan was copied to create the Talen Energy Plan effective in June 2015.  The PPL Plan did *not* provide income supplements to those whose retirements were at ages 45-54 under PPL Plan § 5.3(a)(5), which is the renumbered provision that now appears in the Talen Plan as § 5.3(a)(4).  The drafting mistake occurred when the Talen Plan drafter copied the language of the PPL Plan, deleted the references to all parts of subsection 5.3(a)(3) which consequently were not carried over to the new Talen Plan, and renumbered from that point – without taking into account that PPL § 5.3(a)(4) now appeared in the Talen Plan as § 5.3(a)(3) and that the correct reference in Section 5.3(b) therefore should be to § 5.3(a)(3), the provision for unreduced pensions upon a change in control for those who are age 55 and older, such as plaintiffs and the Class.  This obvious drafting error is the subject of Count Four below.[5]

63.     Because the Talen Plan unlawfully omitted PPL Plan Section 5.3(a)(3)(D) which would have been applicable to plaintiffs and the Class, defendants also eliminated this alternative

---

[5]   A similar scrivener's error appears in Section 5.3(a), which in three places mistakenly refers to the early retirement provisions of "Section 1.12" (the correct section of the predecessor PPL Plan) instead of Section 1.13 (the corresponding correct section of the Talen Energy Plan).

basis for their pension supplements.  In the event that the mis-numbering found in Section 5.3(b) of the Talen Energy Plan is not corrected, either voluntarily by defendants or by the Court, then the omission of PPL Plan Section 5.3(a)(4) from the successor Talen Plan also is unlawful for the reasons stated in Count Three below.

> **H.     Defendants Concealed the Existence and Availability of the CIC Benefits.**

64.     Notwithstanding the legally protected status of the CIC benefits at the time of the Riverstone transactions completed in June 2015 and December 2016, defendants misrepresented and concealed from plaintiffs and the Class both the existence and availability of these CIC benefits.  Defendants' violations deprived plaintiffs and the Class members of the opportunity to make fully informed decisions about their pension benefits.

65.     The summary plan description ("SPD") for the Talen Plan did not disclose the existence or the terms of the CIC benefits.  Second, defendants did not otherwise volunteer this highly material benefits information.  Moreover, defendants did not provide a copy of the dense, 100+ page plan document unless it was specifically requested by a participant.  As noted above, Mr. Sweeney discovered the CIC benefits only by happenstance, when he came across a copy of the first IRS Annual Report Form 5500 for the Talen Energy Plan on the website of the U.S. Department of Labor.  That filing included a summary of key plan provisions, including CIC benefits, that was prepared by the Plan's actuary but not distributed to participants.

**COUNT ONE**

**<u>VIOLATION OF THE TERMS OF THE TALEN ENERGY RETIREMENT PLAN</u>**

66.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 65. This Count is brought by each plaintiff and the Class against defendants the Committee and the Plan.

67.     Each plaintiff and Class member was entitled to receive an unreduced early

retirement pension under the terms of Talen Plan Section 5.3(a)(3) and the terms of the unlawfully omitted PPL Plan Section 5.3(a)(3)(D).

68.     In addition, defendants violated the terms of the Talen Plan by denying to each plaintiff and Class member the monthly pension supplements payable under Section 5.3(b) of the PPL Plan.  As explained above, these benefits were available to plaintiffs and the Class because of their entitlement to receive unreduced early retirement pensions under both (a) the provisions of PPL Plan § 5.3(a)(4), which were carried over in § 5.3(a)(3) of the Talen Energy Plan, and (b) the omitted provisions of PPL Plan § 5.3(a)(3)(D).  Due to the obvious drafting error in preparing the new Talen Energy Retirement Plan, the wrong section of the PPL Plan was referenced in the new Talen Plan document.  In the event that defendants do not correct this error, then the Court should do so through its power to fashion declaratory and injunctive relief.  Alternatively, plaintiffs seek reformation of the Plan to correct this obvious scrivener's error in Count Four below.

69.     Alternatively, defendants' failure to continue the pension supplements as applicable to plaintiffs and the Class violated the Plan terms which were added by the Employee Matters Agreement and the Merger Agreement quoted in paragraphs 34-35 above.   Under established Third Circuit precedent, the provisions of these documents dealing with pension benefits constitute enforceable amendments to the Plan.  These agreements were in writing, contained provisions directed to the ERISA plans, including the Plan, and satisfied the Plan's procedures for adoption of amendments "by or pursuant to action of [the Company's] board of directors."  The pension supplement benefits therefore are incorporated as part of the Plan by virtue of the Employee Matters Agreement and the Agreement and Plan of Merger, without regard to the obvious drafting error which unlawfully omitted the benefits for participants who,

like plaintiffs and the Class, qualified for unreduced pensions.

70.     In violation of their duties to pay plaintiffs and the Class all benefits due to them, defendants the Committee and the Plan engaged in bad faith and did not faithfully carry out the terms of the Plan.  To the contrary, defendants ignored plan terms, afforded them a tortured and false "interpretation," and otherwise abused their discretion.

71.     Defendants also treated plaintiffs and the Class in an arbitrary and unfaithful manner by denying CIC benefits to them while providing the same benefits, governed by the same plan terms and definitions, to former CEO Paul Farr and possibly other favored executives.

72.     Plaintiffs and the Class are entitled to (a) enforce their rights under the Plan and under ERISA and to clarify their rights to benefits, under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (b) secure other relief under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), as may be necessary and appropriate to fully and effectively remedy these violations.  The same sections of ERISA are a basis for monetary, declaratory and equitable relief to fully remedy each of these violations.

## COUNT TWO

### VIOLATION OF ERISA FIDUCIARY DUTIES
### PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

73.     Plaintiffs incorporate paragraphs 1 through 65 by reference as though fully set forth herein.  This Count is brought by each plaintiff and the Class against defendants the Committee and Talen Energy.

74.     Defendants the Committee and Talen Energy at all relevant times were "fiduciaries" within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), with respect to the Plan and the matters complained of herein.

75.     In performing their duties as fiduciaries of the Plan, defendants failed to discharge

the strict fiduciary duties imposed on them by Section 404(a) of ERISA, 29 U.S.C. § 1104(a), to:

a.       act with utmost loyalty to, and solely in the interest of, the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to them;

b.       act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person skilled and expert in the profession of plan administration would use in the conduct of an enterprise of a like character and with like aims;

c.       disclose material information to those to whom their fiduciary duties were owed, including plaintiffs and the Class members, regarding the CIC benefits available to them under the Plan;

d.       ensure that the administration of the Plan complied with the law; and

e.       conduct all benefit claim proceedings with utmost loyalty to the participants while scrupulously avoiding any form of bad faith or other wrongdoing to promote corporate interests.

76.       Under well-established Supreme Court and Third Circuit precedent, ERISA establishes a strict fiduciary duty to accurately and clearly communicate all material benefits information to participants.  This includes the duty to inform participants about benefits to which they may be entitled, even if they do not inquire about, or apply for, these benefits.  In this case, plaintiffs and the Class never learned of the CIC benefits due to defendants' fiduciary violations. As a result of these violations, plaintiffs and the Class members were harmed and should be deemed to have applied for, and been denied, the CIC benefits for purposes of all claims in this case.

77.       In further violation of their strict fiduciary duties, defendants also (a) failed to continue, and failed on a continuing basis to correct the omission of, valuable pension benefits

from the PPL Plan as required by ERISA and the transaction agreements; (b) adopted and implemented illegitimate, tortured "interpretations" of Plan provisions; and (c) engaged in bad faith decision-making during the claim and appeal proceedings for Mr. Sweeney. All plaintiffs and Class members have been harmed by these violations.

78. Each of these forms of conduct constituted breaches of fiduciary duty and violated Section 404(a) of ERISA, 29 U.S.C. § 1104(a). In addition, defendants Talen Energy and the Committee and its individual members are "co-fiduciaries" and are jointly liable for all breaches committed by each other fiduciary defendant under Section 405 of ERISA, 29 U.S.C. § 1105. This is so because (a) each defendant knowingly participated in, or knowingly undertook to conceal, acts or omissions of one or more other fiduciaries which were a breach; (b) each defendant enabled one or more other fiduciaries to commit a fiduciary breach by failing to comply with its own fiduciary duties in the administration of its specific responsibilities giving rise to its status as a fiduciary; and/or (c) each defendant knew of a breach by one or more other fiduciaries but failed to make reasonable efforts under the circumstances to remedy the breach.

79. Plaintiffs and the members of the Class are entitled under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), to enforce their rights under ERISA and secure appropriate monetary, declaratory and equitable relief to fully remedy each of these violations.

80. Plaintiffs and the Class also are entitled to further equitable relief, including entry of an Order requiring an accounting by defendants of all profits and savings to the Plan and to Talen Energy attributable to their fiduciary violations; other surcharges on defendants; and all forms of monetary relief to make plaintiffs whole for all losses and harms caused by the fiduciary violations.

## COUNT THREE

### ILLEGAL CUTBACK AND ELIMINATION OF ACCRUED PENSION BENEFITS IN VIOLATION OF SECTION 204(g) OF ERISA

81.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 65. This Count is brought by each plaintiff and Class member against defendants the Committee and Talen Energy.

82.     The Talen Energy Retirement Plan document unlawfully omitted the basis for unreduced early retirement benefits that was provided under § 5.3(a)(3)(D) of the PPL Plan. Despite defendants' recognition in December 2016 that the omission of other portions of § 5.3(a)(3) violated their legal duty to continue benefits as stated in paragraph 36 above, defendants did nothing to remedy their unlawful omission of § 5.3(a)(3)(D) of the PPL Plan, even when the violation was brought to their attention by former plaintiff Sweeney through his benefit claim and appeal.

83.     The benefit provided under § 5.3(a)(3)(D) of the PPL Plan is an accrued pension benefit, early retirement benefit, and/or retirement-type subsidy within the meaning of ERISA's "anti-cutback" provision, Section 204(g) of ERISA, 29 U.S.C. § 1054(g), applicable regulations, and case law.  Section 204(g)(1) provides that, "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."  Under established Third Circuit precedent, the termination and replacement of a pension plan constitutes an "amendment" of the plan which triggers the protections of Section 204(g).

84.     In addition, under Third Circuit precedent, defendants' unsupported reading and bad faith "interpretation" of the CIC provisions generally, including Section 1.13(b), likewise constitutes a prohibited "amendment" of the plan which triggers the protections of Section 204(g).  Defendants were prohibited from purporting to interpret the CIC provisions in a manner

which denied to plaintiffs and the Class the unreduced early retirement benefits due to them under Talen Plan § 5.3(a)(3).

85.     ERISA Section 204(g)(2) further provides that an amendment that eliminates or reduces an early retirement benefit or retirement-type subsidy "with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." Even if defendants had been permitted by the Agreements to prospectively eliminate the unreduced pension benefits, the accrued portion of the CIC benefits attributable to plaintiffs' and the Class members' service as of the June 1, 2015 effective date of the Talen Energy Retirement Plan could not be eliminated or reduced.

## COUNT FOUR

### REFORMATION OF THE TALEN ENERGY PLAN TO CORRECT THE SCRIVENER'S ERROR OMITTING THE PENSION SUPPLEMENT BENEFITS

86.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 65. This Count is brought by each plaintiff and Class member against all defendants.

87.     ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes the Court to issue monetary, declaratory and equitable relief to fully remedy the violations of plaintiffs' and the Class members' rights.  The monthly pension supplements that had been available to plaintiffs and the Class under PPL Plan §§ 5.3(a)(4) and 5.3(b) were required to be continued for plaintiffs in the successor Talen Energy Plan pursuant to the Employee Matters Agreement and the Merger Agreement.  In addition, the omission of these benefits from the Talen Energy Plan was the result of an obvious scrivener's error in failing to account for the re-numbering of subsections from the carried-over PPL Plan.

88.     Under established Supreme Court and Third Circuit precedent, "The jurisdiction of equity to reform written instruments, where there is a mutual mistake, *or mistake on one side*

*and fraud or inequitable conduct on the other*, is undoubted . . ." *Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892) (emphasis added). "Power to reform written contracts for fraud or mistake is everywhere conceded to courts of equity." *Ivinson v. Hutton*, 98 U.S. 79, 82 (1878).

89.     The Court accordingly should order a reformation of the Talen Energy Plan to correct the language of § 5.3(b) to include reference to the unlawfully omitted provisions of Talen Plan § 5.3(a)(3).

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs and the members of the Class pray as follows:

A.     That the Court declare, adjudge and decree that:

(1)     each plaintiff and Class member is entitled to receive an unreduced early retirement pension under the terms of Plan § 5.3(a)(3);

(2)     defendants unlawfully deleted PPL Plan § 5.3(a)(3)(D) and each plaintiff and Class member is also entitled to receive an unreduced early retirement pension under the terms of that alternative provision;

(3)     defendants mistakenly and/or unlawfully deleted Talen Plan § 5.3(a)(3) and PPL Plan §5.3(a)(3)(D) as bases to receive the pension supplements provided in Plan § 5.3(b) and each plaintiff and Class member is entitled to receive the pension supplements under those provisions; and

(4)     defendants the Committee and Talen Energy violated their strict fiduciary duties under ERISA Section 404(a) by omitting protected pension benefits from the Plan, and by misrepresenting and concealing the terms and availability of the CIC benefits from plaintiffs and the Class.

B.      That the Court enter an order reforming the Talen Energy Retirement Plan in a manner which:

(1)     restores all unlawfully and/or mistakenly omitted benefit provisions; and

(2)     strikes out all provisions which are inconsistent with the Court's ruling on the provisions which must be included in the Plan by operation of law or the terms of the transaction agreements preserving benefits.

C.      That the Court order and enjoin all defendants to:

(1)     take all necessary and effective steps, including special notices, to provide to plaintiffs and all Class members the CIC and PPL Plan § 5.3(a)(3)(D) unreduced early retirement pension benefits and supplements to which they are entitled, including retroactive payment of past due benefits;

(2)     review through a Court-appointed independent fiduciary all previously determined pension benefit applications to identify all participants who have been improperly denied these benefits; and

(3)     issue corrected summary plan descriptions and benefits estimates which clearly and conspicuously inform participants about these benefits.

D.      That the Court enter such other remedial and injunctive relief, including appointment of one or more independent fiduciaries to conduct all future claim proceedings, as may be necessary to ensure that defendants' violations are fully remedied and that appropriate procedures are established to prevent any further acts purporting to reduce or eliminate, or to misrepresent or conceal, protected pension benefits in a manner contrary to the requirements of ERISA;

E.     That the Court award monetary relief to each plaintiff and Class member to:

(1)     restore the principal amounts of the benefits unlawfully denied to him or her;

(2)     surcharge the earnings and other profits garnered by each defendant as a result of its violations and withholding of benefits from plaintiffs and the Class members; and

(3)     restore the investment earnings and other returns that each plaintiff and Class member would have realized if the unlawfully withheld benefits had been correctly paid at the time of their pension applications and retirements, with such payment dates retroactively adjusted for participants who needlessly delayed commencement of their pension benefits in the belief that such delay would increase their benefit amounts.

F.     That the Court award plaintiffs and the Class members and their counsel reasonable costs and expenses, pre- and post-judgment interest, and attorneys' fees; and

G.     That the Court grant such other relief as may be just and proper.

Respectfully submitted,


/s/ Alan M. Sandals
Alan M. Sandals
PA Bar ID No. 36044
**SANDALS & ASSOCIATES, P.C.**
4 Green Hill Road
P.O. Box 385
Washington Depot, CT  06794
(860) 868-1140


/s/ A. Richard Feldman
A. Richard Feldman
PA Bar ID No. 41329
**BAZELON LESS & FELDMAN, P.C.**

One South Broad Street
Suite 1500
Philadelphia, PA 19107
(215) 568-1155

*Counsel for Plaintiffs*

Dated:  November 27, 2020